UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KABILE, LTD., et al., <br><br> Plaintiff, <br><br> v. <br><br> BARDIN LEVAVY, et al., <br><br> Defendants. | Civ. No. 2:11-5078(KM)(MAH) <br><br> OPINION |

**MCNULTY, U.S.D.J.:**

**Introduction**

Kabile, Ltd., invested in a company called Elegant USA, and lost its entire investment. Defendant Bardin Levavy was connected with the ill-fated investment in two capacities. First, Levavy was an attorney for RPG Investment, LLC, the entity through which Kabile invested in Elegant USA. Second, he was a manager of RPG. Kabile asserts claims against Levavy in both of those capacities.

As an attorney, Levavy allegedly should have advised Kabile about the dangers of its investment. Levavy's failure to do so, Kabile claims, constitutes malpractice, misrepresentation, and a breach of fiduciary duty (Counts One, Two, and Three). As a manager of RPG, Levavy allegedly breached his fiduciary duties by signing a loan modification agreement (Count Four). That agreement released three guarantors of a loan that Elegant USA owed to RPG. Two of those three guarantors were Levavy's legal clients. Kabile argues that Levavy acted improperly to benefit his clients, rather than to benefit RPG.

Levavy has moved for summary judgment as to all counts. With respect to Counts One, Two, and Three, Levavy's motion will be granted. Levavy and

1

Kabile did not have a formal attorney/client relationship, and nothing about their interaction caused Levavy to owe an attorney's duty of care to Kabile, a non-client. With respect to the Count Four claim of breach of fiduciary duty, summary judgment will be denied. A genuine issue of material fact exists as to whether Levavy acted in accordance with the duty he owed as a manager of RPG Investment, LLC.

## I.   BACKGROUND

The complaint essentially alleges that Levavy's liability arises from two relevant acts: 1) he prepared the paperwork to assign an interest in RPG to Kabile, and 2) he signed, on behalf of RPG, an agreement to modify the terms of a loan that Elegant USA owed to RPG.

### A.   Assignment of RPG ownership interest to Kabile

Elegant USA was a company that manufactured and sold automotive accessories in the United States. Compl. ¶ 15.[1] Elegant was controlled by two

---

[1] Citations to the record will be abbreviated as follows:

    Amended Complaint, No. 42 ("Compl.")

    Defendant's Brief in Support of Motion for Summary Judgment, No. 96-6 ("Mot.")

    Defendant's Statement of Material Facts not in Dispute, No. 96-1 ("Levavy Stmt.")

    Plaintiff's Statement of Material Facts Not in Dispute, No. 101-2 ("Kabile Stmt.")

    Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and Cross-Motion for Summary Judgment as to Liability on the Fourth Cause of Action, No. 101-1 ("Opp.")

    Plaintiff's Response to Defendant Levavy's Interrogatories, 96-3, Exh. B ("Kabile Interrogatory")

    Deposition of Vanya Ivanova, No. 96-3, Exh. N ("Vanya Ivanova Dep.").

    Deposition of Danny Kordova, No 96-3, Exh. F ("Kordova Deposition").

    *Automotive Innovations, Inc. v. JP Morgan Chase et al.*, No. PAS-L-4000-11, Superior Court of New Jersey, Law Division (October 10, 2012),

2

brothers, Ori Raam and Boaz Raam. *Id.* ¶¶ 16, 22. In late 2004 and early 2005, the Raam brothers began encouraging a friend named Danny Kordova to invest in Elegant USA. *Id.* ¶¶ 2, 21-22. The three held "numerous meetings." *Id.* ¶ 23. In January of 2005, at Ori Raam's apartment, the three agreed orally on the terms of Kordova's investment. *Id.* ¶ 24-25. Kordova's company, Kabile, Ltd., would invest $1 million in Elegant USA in exchange for an ownership interest and other benefits. *Id.* ¶ 26-27. Ori Raam emailed these terms to Kordova on January 26, 2005. *Id.* ¶ 25.

The mechanics of Kordova's investment were indirect. Kordova owned Kabile; Kabile was to be granted an ownership interest in RPG Investment, LLC; and RPG, in turn, would own a portion of Elegant USA. Kordova made his $1 million investment via three wire transfers between January and March 2005. (Levavy Stmt. ¶ 9).

Kordova, Ori Raam, and Boaz Raam continued discussing Kordova's investment in the company. (Compl. ¶ 30). Evenutally, the Raam brothers convinced Kordova make a second $1 million investment in Elegant USA. (Compl. ¶ 31). The record is unclear as to the date of this agreement. Kordova was clear in his deposition, however, that agreement was reached before he ever met with Levavy. (Levavy Stmt. ¶ 17). Indeed, there is no evidence that Levavy had had any involvement with the investment up to this point.

Levavy's first recorded involvement occurred in October 2006, when Ori Raam and Kordova went to Levavy's office. Levavy provided them an "Assignment of Membership Interest in RPG Investment." That Assignment

---

        Certification of Thomas G. Rantas, No. 96-3, Exh. O ("*Automotive v. Chase*").

  Operating Agreement of RPG Investment, LLC, 96-5 ("Operating Agreement").

  Forbearance Agreement and Fourteenth Amendment, No. 96-4, Exh. P, ("Modification").

  Amended and Restated Last Out Participation Agreement, 96-4, Exh. R, ("Last-Out Agrmt").

transferred an interest in RPG from a company called Fagunda Investments to Kabile.

Levavy contends that his role in the transaction was limited to the preparation of the Assignment that effectuated Kabile's acquisition of an interest in RPG. He testified that he did not render any advice to Kordova about the substance or mechanics of the transaction. His conversation with Kordova was limited to "social pleasantries." (Levavy Stmt. ¶ 20).[2]

Finally, in December 2006, Ori Raam again memorialized the terms of Kabile's investment and emailed them to Kordova. (Levavy Stmt ¶ 32).

### B. Modification of loan and release of Guarantors

Count Four (breach of fiduciary duty) arises from Levavy's status, not as an attorney, but as a manager of RPG. As manager, Levavy signed an agreement on behalf of RPG to modify the terms of a loan that Elegant USA owed to RPG. Kabile alleges that Levavy did so in the interest of two of his clients, in breach of Levavy's duty to act in the interest of RPG.

In 2003, Elegant USA obtained a $20,000,000 loan from the Bank of New York. (Mot., 5). General Electric Capital Corporation purchased that loan in 2004. (Kabile Stmt., p. 6 ¶1).

On March 2, 2005, the loan was restructured. That particular restructuring involved two important changes. First, RPG purchased a $12,250,000 portion of that loan for $1,100,000. (Last-Out Agrmt. ¶ 2.1; Mot.,

---

[2] The account of the meeting in Kabile's complaint is different. The complaint alleges that "[i]n the presence of Defendant Levavy, Ori Raam stated that Defendant Levavy is representing Mr. Kordova as well as Elegant USA with regard to the agreement." (Compl. ¶ 34). Levavy allegedly "heard Ori Raam make this claim but remained silent." (Compl. ¶ 35). For purposes of summary judgment, however, Kabile appears to have abandoned this allegation, and he offers no competent evidence in support of it. Kabile's brief does not mention this allegation. The only other place this alleged representation is mentioned is in a response to an interrogatory (Kabile Interrogatory ¶ 8). That response, however, is signed not by Danny Kordova (now deceased), but by his two daughters. One of those daughters, Vanya Ivanova, testified in her deposition that she had no knowledge of the investment in RPG, or of the October 2006 meeting with Levavy. (Vanya Ivanova Dep., 28-29). From the other daughter, Mariana, there appears to be no testimony or evidence of any kind.

6.) Second, three parties (Boaz Raam, Yohanan Hartog, and Elegant Marketing, Inc.) agreed to guarantee Elegant USA's debt. (Kabile Stmt., p. 6 ¶ 4). All three guarantors were members of Elegant USA. If Elegant USA defaulted on its debts to either GECC or RPG, those three individuals stood liable for the unpaid balance. (Kabile Stmt. at 6 ¶ 4. ¶ 5).[3]

On August 16, 2009, Levavy signed another modification to the loan, one that is crucially at issue here. (Kabile Stmt., p.11 ¶ 44). Under the new modification, Elegant USA would make a cash payment to GECC in exchange for cancellation of a substantial portion of the debt. One of the sources of the cash was to be the sale of Elegant USA's "Continental inventory." The amount of the cash payment was not fixed, however; it was to depend on the proceeds of sale. *See* pp. 16-17, *infra*.

That August 2009 modification also affected the existing guaranties on the loan. In exchange for Elegant USA's cash payment to GECC, the guarantors would be released from their guaranties. And they would be released, not just on the portion of the debt owed to GECC, but also on the portion owed to RPG. (Modification ¶ 7). In short, RPG, although it would receive no direct benefit, agreed to release the guarantors from their obligations.

### C. This Action

Kabile filed this action on his own behalf, and also derivatively on behalf of RPG Investment. Based on Levavy's preparation of the paperwork assigning an interest in RPG to Kabile, the complaint alleges negligent misrepresentation and professional malpractice (Counts One through Three). Based on Levavy's signing the loan modification on behalf of RPG, Kabile's complaint alleges that Levavy breached his fiduciary duty to RPG (Count Four).

Kabile claims that Levavy breached a duty by failing to notify Kabile that "the purpose of the transactions was to deprive Plaintiffs of their money and the transactions were structured to allow the Raams to freeze out Plaintiffs of their interest in Elegant USA and render it judgment-proof." (Compl. ¶ 71)

---

[3] This modification also included various other adjustments not relevant to the disposition of this motion.

(Count Three). "Transactions" appears to be a reference to Kabile's investment in RPG. By "freeze-out," Kabile seems to mean that the majority members could make decisions and dispose of company assets without the consent of the minority shareholders. (Opp., 12). Kabile further alleges that Levavy signed the modification releasing the guarantees "to advance the economic interests of Boaz Raam and Elegant Marketing., Inc.," the released guarantors (Compl. ¶ 79). RPG, Kabile argues, had "no economic interest" in releasing those guaranties.

Mr. Kordova died on November 12, 2011. According to the complaint, his assets, including his interest in this litigation, were transferred "pursuant to Bulgarian law" to his two minor daughters, Lilian Kordova and Susan Kordova. (Compl. ¶ 3).[4] Their interests are asserted in this action by their guardians, Mariana Lukova Kordova (for Lilian) and Vanya Zhelyazkova (for Susan). (Compl. ¶¶ 4-5).

## II. DISCUSSION

Levavy has filed a motion for summary judgment as to all four counts. Kabile opposes summary judgment on Counts One through Three (attorney-related claims), and cross-moves for summary judgment on Count Four (breach of fiduciary duty as manager). With respect to Counts One through Three, summary judgment is granted, because Levavy did not owe an attorney's duty of care to Kabile. With respect to Count Four, both sides' motions for summary judgment are denied. There is evidence that the loan modification was favorable to the guarantors and had dubious value to RPG.

---

[4] The Operating Agreement for RPG provides likewise: "A person acquiring a membership interest, including the personal representatives and heirs of a deceased Member, shall have only such rights and shall be subject to all the obligations, as are set forth in this agreement,." See Rantas Cert. Exh. V, § 5.2. The agreement continues, "Upon the death...of an individual Member...that Member's legally authorized personal representative shall have all of the rights of a Member solely for the purpose of settling or managing his estate." Rantas Cert. Exh. V, § 5.7(a).

Thus there is a material issue of fact as to whether Levavy breached his duty of loyalty as a manager of RPG by entering into the modification.

### A. Attorney Malpractice/Misrepresentation/ Fiduciary Breach (Counts 1-3)

Counts One through Three all rest on the contention that Levavy took on the duties of an attorney with respect to Kabile, although Kabile was not formally a client. Had he owed such a duty, Levavy would allegedly have been required to look out for Kabile's interests in the transaction, and to warn Kabile of the potential for being "frozen out" as a minority shareholder. Levavy replies that he was never retained by Kabile, that he never made any representation to Kabile that would have induced reliance on his advice, and that in any event Kabile decided to invest long before he met with Levavy.

When a client actually hires a lawyer, an attorney-client relationship is created. Here, the parties agree that Kabile did not actually retain Levavy. (Mot., 9; Opp., 12). An attorney, though, can owe a duty of care to a third party, even if that party is not formally a client. *Albright v. Burns*, 503 A.2d 386, 389 (N.J. Super. Ct. App. Div. 1986). Whether an attorney owes a duty of care to a non-client is a question of law for the court. *Petrillo v. Bachenberg*, 655 A.2d 1354, 1357 (1995). On summary judgment, factual matters that may bear on that question of law must be resolved in the light most favorable to the non-moving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (interpreting Fed. R. Civ. P. 56); *see also Atl. Paradise Associates, Inc. v. Perskie, Nehmad & Zeltner*, 666 A.2d 211, 214-15 (N.J. Super. Ct. App. Div. 1995) (applying similar summary judgment standard to issue of attorney's duty to third party) ("The question of legal duty owed to the buyer is a question of law. Construing the affidavit most favorably to the plaintiff, as required by summary judgment principles, defendant would have had a duty to plaintiff as a matter of law.").

For a lawyer to owe a duty of care to a non-client, two criteria must be satisfied. First, the lawyer must provide the kind of services that will induce

reliance from the other party. Second, the other party must actually rely on the attorney's conduct. *Petrillo*, 655 A.2d at 1359. I find that the evidence in the record does not create a genuine, material issue of fact as to either criterion.

### 1. *Services that induce reliance*

Not all legal services will justify reliance by a third party who did not retain the lawyer. "[A] lawyer owes a duty to use care...to a non-client when...the lawyer...invites the non-client to rely on the lawyer's opinion or provision of other legal services...."*Petrillo*, 655 A.2d at 1359. *See also Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 265 (2005) ("If the attorney[']s actions are intended to induce a specific non-client[']s reasonable reliance on his or her representations, then there is a relationship between the attorney and the third party.") In *Petrillo*, for example, an attorney represented a seller in a land transaction. The seller had tested the land approximately thirty times to determine if it was conducive to a septic system. The land had passed only two of those thirty tests. *Id.* at 1365-66. However, the attorney sent a "composite report" to a potential buyer falsely stating that the land had passed two of seven tests. *Id.* at 1355. The New Jersey Supreme Court concluded that the attorney either knew or should have known that he was inviting the buyer to part with his money in reliance on this misrepresentation. *Id.* at 1361.

Kabile asserts that Levavy "knew [the investment in RPG] was structured to allow the majority of members to freeze out Kabile, thus depriving Kabile of the benefit of its investment." Opp., 12. But Kabile does not so much as allege that Levavy actually misrepresented anything to Kabile, or that Levavy knew (or should have known) that Kabile was relying on his representations, opinions, or advice.

Levavy did not provide an oral or written opinion about the risks and benefits of investing in RPG. Nor did he counsel Kabile on whether to invest. Indeed, Levavy seems to have offered no advice whatever:

8

> Q. And did you advise [Kabile] about the mechanics of the transaction?
> A. [Levavy] No.
> Q. Did you have any discussion with [Kabile] about it?
> A. No.

Levavy Stmt. ¶ 20, quoting the deposition of Bardin Levavy. Levavy testified that his conversation with Mr. Kordova was limited to "social pleasantries."[5] Levavy does not appear to have done anything more than prepare the documents that legally effectuated Kabile's investment in RPG.

Drafting a document that memorializes or effectuates a transaction does not signal that the transaction is favorable to a party. A document such as an assignment is not reasonably interpreted as an opinion that the transaction is a good deal for all involved. Absent additional facts, the attorney who drafts such a document has no good reason to think that the parties are relying on him for such advice.

In parallel contexts, courts have distinguished between transactional scrivening and the rendering of legal advice. In *Banco Popular*, for example, the court carefully observed that distinction. First, the court found that an attorney who facilitated the transfer of certain assets (allegedly to frustrate creditors) would not thereby have taken on a duty to a non-client. 876 A.2d at 266. In addition, however, the court found that the attorney's role had gone beyond that of scrivener; the attorney also negotiated the terms of a loan guaranty on behalf of his client. In such negotiations, the court said, representations may be "made to induce reliance." In that context, misrepresentations by the attorney may give rise to liability. *Id.*

Similarly, in *Flaherty-Wiebel v. Morris, Downing & Sherred*, 384 F. App'x 173 (3d Cir. 2010), an attorney drafted a pre-nuptial agreement. *Id.* at 175. The agreement misstated the respective shares of the husband and wife in a company they owned jointly. *Id.* Later, the wife sued the attorney for malpractice, complaining that the agreement's misstatement of her ownership

---

[5] Although the complaint describes the meeting differently, Kabile offers no supporting affidavit or evidence cognizable on a Rule 56 motion. *See* n. 2, *supra*.

9

interest had disadvantaged her in divorce negotiations. *Id.* The Court of Appeals affirmed dismissal of the case under Rule 12(b)(6). *Id.* at 176. It held that an attorney who merely memorialized an agreement that the couple had reached owed no duty of care as to the representations therein:

> An attorney who puts into writing an agreement between two parties does not vouch for the representations either party has made to the other. The attorney only puts into writing the representations that the parties intend to make to each other. The act of drafting does not make the attorney responsible for the accuracy of the statements placed on paper. Unlike the property reports compiled by the defendant in *Petrillo*, the "objective purpose" of the pre-nuptial agreement drafted by Johnson was not to induce Flaherty into relying on the representations it contained. Rather, the purpose of this document was to memorialize the parties' mutual agreement. The District Court properly dismissed Flaherty's claim based on the defendant's alleged breach of the duty owed to non-clients.

*Id.* at 177 (internal quotations and citations omitted). Thus, formal documentation of the parties' agreement is fundamentally different from negotiating terms or providing advice.

Levavy's role here was to memorialize and effectuate the agreement that Kabile/Kordova and the Raam brothers had already reached. For sure, Kabile may have been relying on representations *by the Raams*. But nothing suggests that Levavy "should have known" that Kabile was likely to rely on *Levavy's* representations (if indeed Levavy made any).

That failure of proof as to services that would induce reliance is sufficient to require summary judgment for defendant. In the alternative, however, I consider the evidence of actual reliance.

### 2. Actual Reliance

Even where the attorney has made representations that would induce reliance, the court must consider whether the non-client actually relied. *Petrillo*, 655 A.2d at 1359. *See also Best v. Cooper Perskie April Niedelman*

10

*Wagenheim & Levenson, P.A.*, No. L-543-03, 2006 WL 3077724 at *8 (N.J. Super. Ct. App. Div. Nov. 1, 2006) (citing cases and explaining that "[r]eliance is an element in each of the cases in which an attorney's duty of care was extended to a non-client"). Absent actual reliance on the attorney's representations, the courts have denied liability. *See Hewitt v. Allen Canning Co.*, 728 A.2d 319 (N.J. Super. Ct. App. Div. 1999) (finding no duty where non-client did not rely on law firm's discovery violation and there was no misrepresentation); *Best*, 2006 WL 3077724 at *8 ("Given our finding that plaintiffs did not rely on any representations made by defendants, we need not belabor this point further."); *Banco Popular*, 876 A.2d at 266 ("[T]he lack of a misrepresentation by [the attorney] and reliance by the [the non-client] fatally undermines the existence of any duty between them.").

A representative example is *Barsotti v. Merced*, 788 A.2d 802 (N.J. Super. Ct. App. Div. 2002). There, an attorney helped his client, the husband, convey a house to the client's wife. *Id.* at 805. A third party alleged that the transfer had been intended to shield the house from judgment if the client lost a lawsuit. That third party brought suit against the attorney for malpractice. The Court held that the third party possessed no claim for malpractice, in part because "[t]he facts of the case do not evidence reliance by plaintiff upon any action [the attorney] took or failed to take." *Id.* at 810.

Here, too, there is no evidence that that Kabile relied on Levavy's representations, legal services, or advice. *See Petrillo*, 655 A.2d at 1359. Kabile and the Raam brothers agreed upon the terms of Kabile's investment long before Levavy became involved. Kordova negotiated the initial $1 million investment with Boaz Raam and Ori Raam, and the three memorialized their agreement in an email from Ori Raam to Kordova. (Compl. ¶¶ 23-25). The three later negotiated an additional $1 million investment. (Compl. ¶¶ 30-32). Only thereafter did anyone approach Levavy and ask him to draw up legal documents to effect the terms of the deal. *Id.* at ¶ 33. When Kordova arrived in Levavy's office in October 2006, it was the first time Levavy had seen him since

11

"sometime in the 1990's." (Levavy Stmt. ¶ 20). Kordova himself admitted that by the time he met with Levavy, he had already negotiated the investment and had already paid at least the initial $1 million tranche. (Kabile Stmt. ¶¶ 8, 15; see also id. at 3 ¶ 31).

Levavy testified that he had no substantive discussions with Mr. Kordova before Kordova signed the documentation for the investment:

> Q. You didn't have any discussions regarding such issues before you prepared the Assignment of Membership Interest for RPG?
> A. [Levavy] No.
> Q. They just told you the percentage and you just drafted it?
> A. [Levavy] That's correct. Came to my office and signed it.
> Q. And did you advise [Kabile] about the mechanics of the transaction?
> A. [Levavy] No.
> Q. Did you have any discussion with [Kabile] about it?
> A. No.

Levavy Stmt. ¶ 20, quoting the deposition of Bardin Levavy. There is no genuine dispute that Levavy's role was confined to producing the papers documenting the investment. There is no evidence that Kabile relied on any representation by Levavy when Kabile decided to invest in RPG.

Kabile suggests, in a one-paragraph argument in its opposition brief, that Levavy should have explained to Kordova that he could be "frozen out" of RPG. So warned, Kabile "could have acted earlier to recover the funds invested and thus mitigate its damages." (Opp. 13). That contention, of course, begs the question of whether Levavy had any duty to give him legal or practical advice. Further, Kabile has produced no testimony or evidence to substantiate that claim. There is no evidence that Levavy concealed Kabile's minority status from Kabile or Kordova. Kabile has produced no evidence that knowledge of the freeze-out possibility would have prevented it from investing. Indeed, all of Kordova's testimony suggests that he decided to invest, not because he misapprehended his status as a minority stakeholder, but because, wisely or not, he completely trusted the majority stakeholders: "I trusted [the Raam

12

brothers] as much as I was able to give them two million dollars without a piece of paper. Zero." Kabile Stmt. ¶ 15.

Even after investing $2 million, Kordova seems to have done little to monitor his investment:

> Q. Did you do anything between January, February, March, April to understand any situation with regard to Elegant's business operations? ....
>
> A. [Levavy] They were not giving me any information. I was blind. As a matter of fact, I received a paper that I owned 20 percent after I gave them two million dollars. We went to the lawyer in New Jersey and he issued me a paper that I am an owner of 20 percent in Elegant, after paying the money. We work on complete trust between each other.

Kabile Stmt. ¶ 17. Kordova further explained, "The money which was given to Elegant USA was given, as I testified in the beginning on a friendship clear basis. I gave the money not to Elegant, I gave the money to my friend, Boaz Raam, on a word." (Kordova Deposition, 104). The evidence does not remotely suggest that Kabile's investment is attributable to Levavy's failure to warn Kordova of the perils of minority ownership.

"The invitation to rely and reliance are the linchpins of attorney liability to third parties." *Banco Popular*, 876 A.2d at 265. Here, there is no evidence of either. There was no invitation to rely, no circumstances suggesting that reliance should have been expected, and no actual reliance. This is in fact resembles the very case that the New Jersey Supreme Court described as *not* giving rise to a duty: "In *Petrillo*, we never suggested, even obliquely, that a duty would arise in the circumstances at hand, involving no representations, no reliance, and a remote third party with whom the attorney had no relationship." *Banco Popular*, 876 A.2d 266.

Levavy did not owe an attorney's duty of care to Kabile, and Kabile did not rely on his advice. Summary judgment should therefore be entered for Levavy on Counts One through Three.

13

### B. Breach of fiduciary duty (Count 4)

In addition to serving as RPG's attorney, Levavy served as a non-member manager of RPG. Kabile argues that, as a manager of RPG, Levavy owed RPG a fiduciary duty. When Levavy signed the loan modification and released the guarantors, he allegedly acted, not to benefit RPG, but to benefit his clients, Boaz Raam and Elegant Marketing, Inc. (Complaint ¶ 79). Asserting a derivative claim on RPG's behalf, Kabile claims that Levavy thereby breached his fiduciary duty to RPG. Both sides cross-move for summary judgment on Count Four.

Levavy owed RPG a duty of loyalty and care. True, the operating agreement of RPG does not explicitly impose any fiduciary duties on non-member managers. But where an operating agreement is silent, Delaware law[6] imposes default duties on managers and managing members: "In any case not provided for in this chapter, the rules of law and equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern." Del. Code Ann. tit. 6, § 18-1104. *See also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 660-61 & n.1 (Del. Ch. 2012) (collecting cases). Those default fiduciary duties include the duties of loyalty and care. *See Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, No. CIV. A. 3658, 2009 WL 1124451, at *8 (Del. Ch. Apr. 20, 2009) ("But, in the absence of a contrary provision in the LLC agreement, the manager of an LLC owes the traditional fiduciary duties of loyalty and care to the members of the LLC.") (footnote omitted); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Technologies Inc.*, 854 A.2d 121, 153 (Del. Ch. 2004); *VGS, Inc. v. Castiel*, No. C.A. 17995, 2000 WL 1277372, at *4 (Del. Ch. Aug. 31, 2000) *aff'd*, 781 A.2d 696 (Del. 2001).

The issue of whether Levavy was RPG's "manager" within the meaning of the statute need not detain the court at this stage. First, there is at least an issue of fact on the point, precluding an adverse finding on summary

---

[6] RPG is a Delaware limited liability company. *See* Operating Agrmt ¶¶ 1.1, 11.10.

14

judgment. The Operating Agreement for RPG states that the Company will be managed by a "Manager." (Operating Agreement ¶ 7.1). Levavy signed a loan modification on behalf of RPG, and listed his title as "Manager." (Modification, Signature Page). Neither party contends that Levavy lacked the actual authority to do so. Second, Levavy was, at the very least, an agent of RPG. As an agent, he owed his principal, RPG, a duty of loyalty. *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.) *aff'd*, 11 A.3d 749 (Del. 2010) ("Under fundamental principles of agency law, an agent owes his principal a duty of loyalty, good faith, and fair dealing.").

Classically, a manager or agent may breach the duty of loyalty in two situations: when the manager participates in a corporate decision that directly or indirectly benefits the manager, or where the manager's relationship with an interested party may affect the manager's independent judgment. *See In re ALH Holdings LLC*, 675 F. Supp. 2d 462, 482 (D. Del. 2009). The first, self-dealing scenario seems the more pertinent of the two. In the corporate context, self-dealing has been described as follows:

> The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally. Essentially any corporate decision which directly or indirectly confers a benefit upon a participating director can implicate the broadly construed duty of loyalty.

*Id.*[7]

---

[7] The second, more general conflict-of-interest scenario has been described as follows:

> [T]he duty of loyalty also arises in the corporate setting where a relationship with an interested party may affect the independent judgment of the director. Specifically, a court should inquire into whether this relationship rises to a level where the interested party controls the director. The Delaware Chancery Court has explained that a controlled director is dominated by the interested party, whether through close personal or familial relationship or through force of will. A director can also be controlled by another if the challenged director is beholden to the allegedly controlling entity. A director may be considered beholden to

15

There is a sufficient showing that the loan modification helped Boaz Raam and Elegant Marketing by letting them off the hook as guarantors. Both were clients of Levavy. There is at least an issue of fact as to whether a benefit to them constituted a benefit to him, and as to the circumstances under which Levavy exercised his authority.

At the time Elegant USA entered into the loan modification, Elegant owed approximately $11,370,187.78 to GECC (Modification ¶ 22(a)), and it owed another $15,612,719.09 to RPG. (Modification ¶ 22(a)). Elegant USA was in default on its loan to GECC (and presumably on its loan to RPG as well). (Modification, 1).

Under the modification agreement, Elegant agreed to pay $1 million to GECC. (Modification ¶ 6(c)). It would then sell a specified portion of its inventory (the "Continental inventory") and deliver all of the proceeds to GECC. (Modification ¶ 6(b)(i)). If the proceeds from that inventory sale were less than $800,000, Elegant would pay GECC the difference. (Modification ¶ 6(c)). Once Elegant made the agreed payments, it would be released from the $11.3 million debt it owed to GECC and GECC would forbear from exercising its remedies as creditor. (Modification ¶¶ 1, 5(a), 6(e)).

The three guarantors agreed to pay GECC $719,035. (Modification ¶ 7). That amount, however, could vary. If the sale of Elegant's Continental inventory generated more than $800,000, then any excess would reduce the obligation of the guarantors. *Id.* If sale generated less than $800,000, and if Elegant did not make up the difference, the guarantors would be obligated to

---

(and thus controlled by) another when the allegedly controlling entity has the unilateral power (whether direct or indirect through control over other decision makers), to decide whether the challenged director continues to receive a benefit, financial or otherwise, upon which the challenged director is so dependent or is of such subjective material importance to him that the threatened loss of that benefit might create a reason to question whether the controlled director is able to consider the corporate merits of the challenged transaction objectively.

*In re ALH Holdings LLC*, 675 F. Supp. 2d 462, 482 (D. Del. 2009) (internal footnotes, citations, and alterations omitted).

16

pay the difference, on top of the $719,035. *Id.* In exchange, the guarantors would be released from all their obligations. Thus the guarantors might pay anywhere from $0 to $1,519,035. But in any case, that payment would go to GECC, not to RPG.

That restructuring, however, did not only release the guarantors from their obligations on the GECC loan; it also released them from their guaranty on the RPG loan. *Id.* RPG was releasing three guarantors from their obligations with respect to more than $15 million in troubled loans, in return for no direct benefit.

Levavy makes a number of arguments that this modification, which seemingly benefited everyone involved *except* RPG, did not pose a conflict. He argues, for example, that the RPG guaranties were subordinate to those of GECC and therefore worthless, or that a generally advantageous restructuring could not have occurred without RPG's release.[8] He may even be correct. I find, however, that these matters pose issues of fact; the summary judgment evidence that Levavy did or did not breach any duty is conflicted or incomplete.

One issue remains. RPG's operating agreement contains an "Exculpation of Liability" provision. *See* Operating Agreement ¶ 9.1. Levavy contends that, notwithstanding the matters discussed above, summary judgment remains appropriate because this provision absolves him liability for any breach of fiduciary duty he may have committed.

---

[8]    Levavy points to a related New Jersey state court decision in which the Court stated that "[t]here is no evidence to permit a finding, or even an inference, that RPG's acceptance of GECC's agreement to release certain guarantees given by Elegant and Boaz Raam, was extraneous to and an unnecessary component of GECC's factoring agreement with Coral." (Automotive v. Chase, 18-19). That statement is sandwiched between two others that seem to relate to an entirely different transaction, involving Bergen Investments. Among the factors that a New Jersey court would consider in deciding whether to give preclusive effect to a prior finding are (1) whether the issue was actually litigated in the prior proceeding; and (2) the determination of the issue was essential to the prior judgment. *Winters v. N. Hudson Reg'l Fire & Rescue*, 50 A.3d 649, 659 (N.J. 2012). It appears that plaintiffs in the prior action withdrew any claims related to the loan modification at issue in this case, and that the issue therefore was not actually litigated. (Opp. 10). Levavy makes no demonstration that the court's statement, if it relates to this loan modification, was essential to its judgment.

17

The exculpation clause states:

> 9.1     **Exculpation of liability**. Unless otherwise provided by law or expressly assumed, the debts, obligations and liabilities of the Company, whether arising in contact, tort or otherwise, shall be solely the debts, obligations and liabilities of the company; and no Member, manager, employee or agent of the Company shall be obligated personally for any such debt, obligation or liability of the company, or for any debt, obligation or liability of any other Member, manager; employee or agent of the Company, by reason of being a Member, or acting as a manager, employee or agent of the company.

Operating Agreement ¶ 9.1.

Read straightforwardly, this provision simply means that a manager will not, by virtue of that status, be held personally liable for debts and liabilities incurred by RPG. But Kabile is not attempting to hold Levavy liable for some obligation incurred by RPG. Rather, Kabile (in the shoes of RPG) alleges that Levavy breached the fiduciary duty that he personally owed to RPG. Particularly on summary judgment, I cannot find that this exculpation clause provides shelter from such an allegation.[9]

In sum, there is a material issue of fact as to whether Levavy breached his duty of loyalty to RPG when he signed the loan modification on its behalf. Both sides' motions for summary judgment on Count Four are therefore denied.

---

[9]     Delaware law, as Levavy points out, allows an operating agreement to waive an individual's personal liability to an LLC for breaches of fiduciary duty. Del. Code Ann. tit. 6, § 18-1101. But to say that *an* operating agreement *may* do that is not to say that *this* operating agreement *did* do that. Indeed, the statutory basis for this exculpation clause seems to lie elsewhere. *See* Delaware Limited Liability Company Act, 6 Del. C. § 18-303(a) ("no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company."); *see also Pepsi-Cola Bot. Co. of Salisbury, Md. v. Handy*, No. 1973-S, 2000 WL 364199, at *3 (Del. Ch. Mar. 15, 2000).

**Conclusion**

Levavy's motion for summary judgment will be granted as to the malpractice, misrepresentation, and breach of fiduciary claims relating to Levavy's conduct as an attorney (Counts One through Three). Levavy's motion will be denied with as to the claim of breach of fiduciary duty with respect to his conduct as a manager of RPG (Count Four). Likewise, Kabile's cross-motion for summary judgment on Count Four will be denied.

Dated: January 6, 2015
Newark, New Jersey

**Kevin McNulty
United States District Judge**

19